Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial, Chemical and Service Workers International Union, et al, exceed 50 minutes per side, Mr. Lipschultz, will you come up? Good morning. May it please the court. The district court in this case erred in refusing to dismiss the plaintiff's claims under the six-month statute of limitations contained in Section 10B of the National Labor Relations Act. The six-month statute of limitations under 10B applies in breach of contract actions under Section 301 of the LMRA where those claims, number one, involve conduct that is closely analogous to an unfair labor practice charge, and number two, where the practicalities of litigation and federal policies dictate a shorter limitations period. This is just such a case, and this court ruled in Cummings v. John Murrell that a six-month limitations period applied in a Section 301 case where the court was required to essentially unpack or plumb the depths of the collective bargaining relationship. And the union in that case, just like they did in this case, filed an unfair labor practice charge based on the same allegations in the lawsuit. In this particular situation, the district court appeared to presume that the six-month period can only apply when you have what's called a hybrid Section 301 claim. That is, when there's an allegation that the union has breached its duty of fair representation and an allegation of breach of contract. But this court has held several times that the six-month period is not so limited. Now, in this case, there's no question that the dispute centers on the formation of a collective bargaining agreement. The dispute required the parties to look at the bargaining process, to look at documents that were exchanged as part of the bargaining process, to try to discern, at least according to the union's theory, what the deal was. Coca-Cola's theory is the deal is the signed collective bargaining agreement, which states that wage increases will occur in March on specified dates in Appendix A. The union has sought reformation, and the district court agreed. But to do that, the district court had to analyze, and the union certainly pointed them to, tentative agreements, something they called a red-line document that was used at ratification meetings, all things that are not amenable to a long statute of limitations period, all things about contract formation. And that's what makes this case so different than the authority the district court and the union rely upon. They rely primarily on two cases for their limitations argument, UAW versus Hoosier-Cardinal, which was a Section 301 breach of contract case where there was no dispute about formation, no dispute about what the contract meant, the contract was clear, and the employer breached it by its terms. And this court actually stated in Cummings, I believe on page 502, Hoosier-Cardinal was not about formation, so it's distinguishable. The Craftco case, same issue. The dispute there was over the signed collective bargaining agreement and the pension obligations that were set forth in that document. Nobody ever argued that the signed collective bargaining agreement wasn't the party's deal in Craftco. No party ever argued there was a defect in formation in Craftco, so the policy reasons that counsel in favor of applying a shorter limitations period simply weren't there. This court recognized that several times after Craftco when it said in pension matters, speed and finality isn't quite as pressing as it is in day-to-day employment matters. And, of course, in Craftco there was no underlying unfair labor practice charge that mirrored the allegations in the breach of contract claim. So our case is very, very different than most of the cases. I've got just a couple of questions for you. First of all, if the court finds that there was basically a mutual mistake in the agreements, so both parties sort of was mistaken, what's the result if that's the finding? The finding in this particular case, if the finding is there was clear and convincing evidence of a mutual mistake, which is what the district court found, the district court's remedy was to reform the contract in accordance with what it found to be the party's intent. In other words, if there's a mistake in writing and there's clear and convincing evidence that the writing doesn't reflect the actual agreement, the remedy in what the district court did in this case is insert October wage increase dates in lieu of the March wage increase dates that were actually in the signed contract. So classic contract interpretation or remedies? An equitable reformation remedy. That's correct. Okay. Now, so Coca-Cola declined to arbitrate, and they asserted that they would proceed with the March wage increase dates. The company was still capable of complying with the union's expected October dates any time prior to that passage. Correct? If they made that determination. The company was very clear, Your Honor, and I understand where you're going with the question, and the record is very clear, which is when this issue came up in July of 2010, the company clearly said to the union the March dates control, not the October dates, and union President Martin admitted he knew in July of 2010 the wage increases were not going to happen in October, and business agent Dietrich had the same conversation, and it was twofold. Number one, are you going to change the dates to October? And number two, if you're not, are you willing to arbitrate, as Your Honor alluded to? He was told unambiguously no, and he admitted at his deposition that on or around July 22, 2010, he knew two things. Number one, that Coca-Cola was going to stay with the March dates. There was nothing tentative. There was nothing uncertain. He knew there were going to be no October wage increases, and he also knew that the company wasn't going to arbitrate it. There's no question that the limitations period would run starting in July in this case, based on what was communicated to both the local and international union. So that's why we believe it's clear that this action is barred if the six-month limitation period is imposed. So we think that's dispositive of the question in this particular case. And I think there's important policy reasons. As it stands, the parties were forced to negotiate a successor agreement not knowing, having the uncertainty of this liability. It would be even magnified. It could be two contract cycles where a union could reach back and say. That would be true if it was just a pure contract issue instead of a reformation issue, just a contract interpretation issue. You'd have the same problem, right? Well, you wouldn't have the same problem, Your Honor, in the following sense. In the cases where they've applied the state limitations period and there's no unpacking of the bargaining process, it's we have a signed document. You didn't comply with it. There's no concern of that nature. But when you have a contract formation case. I'm not talking about a dispute as to whether you complied. I'm talking about a dispute as to the meaning of the contract. So you could have a dispute. Maybe it was ambiguous. I mean, this is hypothetical now because the nature of this one has to do with reformation, right? Sure. But you could have another contract dispute where the stakes were identical but the nature of the issue was a pure contract interpretation and you'd be making the same arguments, but they wouldn't float, right? Well, I think it depends on the case whether they would float or not. In a given case. I guess what I'm saying is it's in the nature of some contract disputes that are purely contract disputes that they're going to have consequences years into the next bargaining cycle. That's the nature of contract disputes, right, that have a six-year limitation, right? I think that's right, Your Honor, and it becomes more compelling to avoid the state statute of limitations where you're unpacking a bargaining process. We think there are different considerations. So you're right as a general matter when you're talking about reformation, it may involve going back and talking about contract negotiation, whether those arguments are compelling to borrow the 10B period is going to depend on what you're talking about. I'm just wondering about the practical argument you're making, that it will affect the negotiations the cycle after next when we don't know what exactly we owed two cycles ago. It seems to me that's going to apply whenever you have a purely contractual issue. Well, when you say purely contractual issue, just to put a – I mean a contractual issue that's not a reformation issue, but a, you know, did they mean two or did they mean 20? Right. That's not a did you comply, that's what does it mean. What does it mean, correct. And what's unusual about this case is nobody is looking at the signed agreement saying what does it mean. I understand that. That's why it's a hypothetical. Right. But the hypothetical raises the identical concern that you're saying is dispositive here or weighty, and I'm just saying it doesn't seem to be weighty because it would apply – the argument would apply when it clearly wouldn't matter. Right. We think – understand the point, Your Honor. I want to go back to the point I raised earlier, because given that the union's claim would not have become ripe until the October dates passed and an injury was suffered, the claim would have been within the six-month limitations period, regardless of whether the six-month or six-year period applied, wouldn't it? And so in that case, how – why wouldn't this be a successful argument? You're right, Judge Donnell. If you conclude that the claim accrued in October rather than, we say, in July, you're right. It's within the 10B period. So to accept Coca-Cola's argument, you need to accept two things. Number one, that it accrued in July and that the six-month period was triggered in July when they were given unambiguous notice that this is how the contract was going to be administered. So you're correct. If the union is correct that it accrues in October, you're right. The complaint was timely. And that's when your client said, no, we're not going to arbitrate. No, we're not going to reform the contract. Correct, in July of 2010. And there's no record evidence that there was anything tentative or the union had any belief or understanding that that answer was going to change. So that's why we believe the 10B period was triggered in July rather than October. Now, with respect to the merits here, the clear and convincing standard is an extremely weighty one. It is to leave the fact finder with no doubt of what the parties agreed to. And we think there was a fundamental error by the district court in this case because she relied on the tentative agreement as clear and convincing evidence of a mutual mistake. In other words, based on the tentative agreement, the district judge said clearly and convincingly both parties agreed to October wage increase dates. But then in the next breath, she concluded that the very document she was relying on was ambiguous and that either party's interpretation was reasonable. We submit that you cannot meet the clear and convincing standard based on a document that is ambiguous. The other record evidence on this point is the union president's testimony that he believed at most the parties had a different understanding of what the year one, year two, and year three language meant. Again, that does not support a finding of clear and convincing evidence that both parties agreed to October. I think that your opposing counsel doesn't adopt the argument of the district court that it's ambiguous, but rather argues that it's not ambiguous. That's what he argued, yes. We're not bound by the district court's statement that it's ambiguous if your opposing counsel is correct that it's not ambiguous. Is that correct? That's correct. I disagree that it's unambiguous, of course. I know, but then let's address that. So the year one, year two, year three language. Sure looks unambiguous unless you sort of know other things. Right, it's not unambiguous. That's how most people would read it, I think. I think it depends on the context here. But the context has to do with what's gone on before, these prior March dates, right? Correct. Without that, it's pretty darn unambiguous, wouldn't you say? I wouldn't say it's unambiguous because a year means something different depending on what the parties are talking about in their contract, and particularly when the very document that says year one, year two, year three on the cover says, look to our prior contract for anything that is not set forth in this document, including Appendix A. The only specific dates in this record for the wage increases are in Appendix A. So year one, year two, year three, that's an interpretation would be that must mean anniversary dates. But it's not the only interpretation. And the company had a different interpretation. It isn't so much that it means the anniversary dates. It seems on its face or appears on its face that you get the raise during year one. And year one is for a three-year contract that goes from one date to three years later the identical date. I can't imagine anyone saying year one isn't the first 12 months of those three years. I mean, unless you say, well, but it has an esoteric meaning if you know the context or whatever. Yeah, I think that I'm out of my time, but can I answer your question? I think in this context, when you look at year one, year two, year three, the parties had just received a wage increase in March. The company interpreted the year period. It's a question of when the increase occurs. Nobody disputes that wage increases occurred during each of the years of the contract. It's a question of when they were to occur. And that should be controlled by the explicit language the parties used. Okay. Thank you. Thank you, counsel. May it please the court. Stuart Israel on behalf of the unions. This case raises two questions for the court. One is governed by the traditional rules of contractual interpretation, including the reformation doctrine applied as a question of law by the court to the agreement made by the parties, which the undisputed record shows was made in September 2009. The reformation doctrine does not say reform a contract. It says, where appropriate, reform later writings that are at variance with the earlier agreement to conform the later writings to the earlier agreement. These later writings are the signed and executed contracts, though, right? Well. Phrasing it in a convenient way for you to call them later writings. I mean, they're the actual instantiation of the contract. Judge Rogers, I would — pardon me? Is that right or wrong? I would disagree with that. I would say that the agreement was done on September 28, 2009, when the parties negotiated, reduced to writing, signed, and two days later ratified the contract. And it had that year one, year two, year three language in it. In fact, that language was proposed by the company. That was, as multiple company negotiators admitted, that was the deal. The deal was in a written and signed tentative agreement subject only to the later condition of ratification, which happened two days later. All these other things, including the signed booklet, was, to borrow from the Seventh Circuit, a goof. We're not saying there wasn't a goof. I won't make air quotes every time I say goof. There certainly was, which is why we are here. Well, some language was put in there that's inconsistent with the way that they say they understood it. But, you know, they had a chance to proofread it, right? I mean, why proofread it if it doesn't matter? They goofed when they proofread it. They did not do a good job proofreading it. Prior to signing? Prior to signing, the local signed blank pages. The international signatures came because the international assumed that the local proofread. It was a comedy of errors, and we certainly can't say that mistakes were not made. But what we can say unequivocally is that all the parties agreed that that earlier document was the agreement, the written signed and ratified agreement. The argument made, as I understand it, is that the raises had been in March during the previous cycles, during the previous agreements, right? Well, that's true, but it omits an extremely important point. The four raises under the previous agreement occurred on the date of ratification and on the three subsequent anniversary dates. All of which were March. All of which were March. Some people might think that's all you need to make it ambiguous. You're arguing now that it's not ambiguous, despite what the district court said. I take it. The argument that there's at least some ambiguity is that it's always been on March, and if you gave a raise in October, that would be a raise after only six months since your last raise, that that's not what people are expecting or thinking. Well, there was a year one wait. There's a year one wait. Wage freeze. It's either going to be a six month or an 18 month, I guess. Well, the first raise would have either been on the anniversary date of the contract, 12 months after the contract began, or an 18 months after the last raise. That's what we say is clear. The new contract starts in October, and there had been a raise in previous March. Yes. So they just got a month. So to expect them to get a raise immediately you might say is not necessarily what was expected, and so you would say that would be a six month one, right? Well, the plant manager and the negotiator testified that his assumption was that the employees were entitled to an annual increase. And if they just skipped an annual increase and then one year after their last increase, or two years after their last increase, they got an increase, then it would be March dates, right? If that's what they agreed to? Well, it would be. They said you got an increase six months before this one started. You're going to go a year when you normally would get a – if you're proceeding on a yearly basis, then a year after that when you would normally get an increase, you don't get one. And then a year after that, you do get one. It kind of makes sense, right? It may not be literally what it said, but it kind of makes sense. And that's what I think they're saying the context is. It would seem like if you don't get a raise one – if you've been getting them every March and you don't get a raise one year, but you do get one the next year, it would be two years later, which would be March. Judge, I disagree. That's the best argument, but it sort of holds together, doesn't it? I see what you're saying, and I have to answer to that. I have to say, no, it doesn't. And I have to – I'll quote you to support that. Most people seeing that there's a three-year contract that runs from October through September and that there's a year one wage freeze, a year two 2% increase – That's a good quote. I buy it. But it did say most people. Some people are going to look at it the other way, right? Well, that is where I disagree with the judge, with the district judge, but I also have to invoke what the district judge said. She said that the four corners of the year one, year two, year three language was in itself ambiguous, perhaps thinking along the same lines as you just articulated. But then she resolved the ambiguity under the traditional rules of contractual interpretation by looking at the contract as an integrated whole by applying contractual context. And what she found there were five fringe benefit increases and lump sum payments. Each one of them – Let me interrupt you. Isn't that the analysis you would use if you were just sort of de novo trying to figure out what the contract means? But here we're talking about reformation, which means it has to meet a higher standard of clarity, doesn't it? Well, I – To change what literally got signed? It's two steps, but it's the same process, Judge. First, you look at what the wage language says. If it is ambiguous, then you look to the remainder of the contract to resolve the ambiguity. When the ambiguity is resolved and that September 2009 agreement is crystal clear, then you look at the later writing to see if it's at variance. And it is at variance. It has a little bit of a strapping feel to it. Well, I have to say that if we look at the – that's where I differ with the district court. I think year one, year two, year three is unambiguous. Nevertheless – It's a much more coherent argument than to say it was ambiguous but became crystal clear by the use of interpretation to make the ambiguity clear. And now that it's clear, it's a basis for reformation. That sounds like bootstrapping. Well, I – It's not clear. You used to say it's clear all along. I have to say that application of the traditional contract rules, which requires reading of the agreement as an integrated whole, is the way courts, as a matter of law, interpret what the agreement means. And that is the first step in the reformation process. I'd like to – the second point that is before this court is the statute of limitations. And I think that the district court had this right and that Coca-Cola has this wrong. The rules are very clear. The controlling authority is the Supreme Court's Hoosier Cardinal case and the Sixth Circuit's Craft Co. case. These are the foundational decisions. They say that in a Section 301 collective bargaining agreement enforcement suit is governed by the most analogous state law statute of limitation because a breach of CBA is a breach of contract that, in this case, is the six-year Michigan statute of limitations. It's also the six-year Ohio and the six-year Tennessee applied in other courts. There is a very narrow exception to this. And that is the tail wagging the dog, but that's the tail that Coca-Cola wants this court to apply. It says that where the case, the 301 case, is not really a contract breach case, doesn't require interpretation of the four corners of the contract and the traditional contract rules, but really applies NLRA duties, statutory duties, not contractual interpretation, but statutory duties. In those narrow cases, the six-month limitation period of the National Labor Relations Act applies. And what are the cases that apply that? The Supreme Court applied it in the Del Costello case where the issue was, did the union act arbitrarily or discriminatorily toward its own members? That is a duty that arises solely and implicitly under statute. It is not a contract duty.  Cummings addressed employer bad faith bargaining, retaliation, quote, unquote, prevarications, and other misconduct affecting the integrity of the bargaining process. Those are 8A1 and 8A3 NLRA violations. That's why Cummings applied the six-month NLRB case because it talks about bargaining integrity. This case is like Hoosier, Cardinal, and Kraftko. It is, what does the contract say? Was the contract breached? The six-year limitations period applies, and Cummings and Del Costello offered by Coca-Cola are a square peg in a round hole. This is a straightforward contract breach case. I want to say something about reformation. Judge Donald, you used the term mutual mistake, which almost all the cases use. But we have authority in our brief that shows, that defines what mutual mistake is, and it's not two parties have to, the two parties to a contract have to share their mistake. Rather, it's the variance rule. If the party's agreement, whether it's oral or in writing, is at variance, differs from a later manifestation of that agreement, that is sufficient for reformation. And we cite several treatises. We cite other cases. Reformation is, while perhaps this doesn't come up all that often in collective bargaining agreement cases, the Sixth Circuit has applied the reformation doctrine in Alexander, and we cite Seventh, Eighth, and Ninth Circuit cases that do as well. With regard to the substance of the agreement, every one of the interpretive devices used by courts to apply to collective bargaining agreements militates in favor of the district court judge's ruling and what we argue here. And it's all supported by Coca-Cola admissions. There is a gulf between what Coca-Cola argues in its brief and what its own witnesses, its negotiators admitted at deposition. They admitted that the deal was done, that there were no more hurdles, that the parties had an agreement when the tentative agreement was signed and ratified in September 2009. All of this stuff that comes after, the proofreading mistakes, the booklet, the printed booklet and that sort of thing, that comes after the agreement. And in that sense, it's superfluous to what the parties agreed to. It's a three-year contract. It runs from October through September. The company officials admitted that year two was October 1st through September 30th, 2010, 2011. Of course they admitted it, but the argument is that this raise took place during that year. I know you disagree with that, but the fact that they admit that that's the second year doesn't really get you very far. They admitted what year one was. And when you choose – Year one was obviously the first year of the agreement. Their raise or the non-raise was during year one and the raise was during year two and the other raise was during year three. Your Honor, the word during does not appear in the contract. It says – What does then? It just says year one. It doesn't say at the beginning of year one. Yes. It does? No, no, no. It does not say during. It says year one, there's a freeze. I just think you overstate the record when you say that they agree that it starts at the beginning of this year when all they've done is say when the year is. Well, the question asked was what is year two? And the answer was October 1st, 2010. Of course it is. But that doesn't mean that it doesn't necessarily follow in their minds or in the minds of the person who's thinking about these March dates that it's March of that year that it becomes effective or that it's October of that year that it becomes effective. Well, I believe that you've put your finger on the problem. Why this is a controversy at all is because Coca-Cola relies on beliefs and expectations instead of the objective evidence. And the objective evidence is not only the contract language, but it's the course of dealing, the party's history, and the comparatives between the fringe benefits where the parties negotiated specific trigger dates other than anniversary dates, and they used that terminology for everything except the wages. They stuck to the year one, year two, year three. And we think that that has a plain, clear, and simple meaning. Okay. Other questions? No, thank you. Thank you. Your Honors, Coca-Cola isn't relying on beliefs. It's relying on the signed document that all parties executed. It's very clear and unambiguous what that document says. Now, with respect to Mr. Israel's last comment about the other fringe benefit dates, we think that supports our position more than theirs, which is that all of those dates were to be carried forward from the prior agreement, and the only reason the March dates themselves were not set forth in the tentative agreement is because they were in Appendix A, which had yet to be prepared. And that's the problem with this whole exercise that we're having here, is we're relying on documents that are interim, that are tentative, that are incomplete. That's why the NLRA requires that parties later embody their agreement and sign a collective bargaining agreement. If Coca-Cola had taken the position, or the union had taken the position, that the tentative settlement agreement was it and no further action needed to be taken, it would have been an unfair labor practice charge. Why? Because the parties are to execute an integrated agreement. Everybody knew that the tentative settlement agreement was incomplete. That's why at the ratification meeting the union said, don't worry, to its membership, Appendix A isn't in there yet, but it will be, and that's why you have a proofreading process to look at the agreement and make corrections as the union president did, and change things and make sure that it's in order before it's signed. And all of that is being unpacked in this lawsuit. And there's a dramatic effect here. If the parties are going to undo a signed explicit contract, they have to meet a high threshold, which wasn't met here. The year one, year two, year three language is not clear and unambiguous. It's not clear and convincing evidence in the context of this case. And that's the burden and the threshold they needed to meet to obtain really what is dramatic, dramatic relief in this particular situation. We don't think that the language met the threshold, and we think this court should reverse the district court and enter summary judgment for Coca-Cola. Thank you. The case will be submitted.